U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 JUN 27 PM 4: 20

CLERK
BY
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | Case No. 2:15-cr-174-1 |
| HOWARD HOISINGTON, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER DENYING
DEFENDANT'S MOTION TO SUPPRESS**
(Doc. 119)

This matter came before the court on May 25, 2017 for an evidentiary hearing on Defendant Howard Hoisington's motion to suppress (Doc. 119). Defendant contends that he was subjected to a warrantless and unlawful "across the threshold" arrest on the night of December 15, 2015 and moves to suppress the fruits of his arrest on that basis.[1] The government opposes the motion, arguing that Defendant's arrest did not violate the Constitution because it took place pursuant to a valid search warrant or, in the alternative, because he was subject to arrest pursuant to his furlough conditions. The court took the motion under advisement on May 25, 2017.

Pursuant to a Second Superseding Indictment, Defendant is charged with one count of conspiring to commit robbery in violation of 18 U.S.C. § 1951(a), four counts of robbery in violation of 18 U.S.C. §§ 1951(a) and 2, and one count of maliciously damaging and destroying a building used in interstate commerce by means of fire and explosive materials, which proximately caused the death of one person and bodily injury to another, in violation of 18 U.S.C. §§ 844(i) and 2.

---

[1] Because the government has conceded it will not use Defendant's post-arrest statements in its case-in-chief, Defendant's motion to suppress those statements under *Miranda v. Arizona*, 384 U.S. 436 (1966) is now moot.

The government is represented by Assistant United States Attorneys Paul J. Van de Graaf and John J. Boscia. Defendant is represented by Assistant Federal Public Defenders Steven L. Barth and Elizabeth K. Quinn.

I. **Findings of Fact.**

In December of 2015, Defendant was serving a criminal sentence on furlough through an agreement with the Vermont Department of Corrections Probation and Parole Office ("VT DOC"), and was living at his parents' home in Berlin, Vermont (the "Hoisington residence"). While on furlough, Defendant agreed to the following conditions:

> I will allow my assigned Probation Officer or designee to visit me in my home or place of employment or elsewhere at any time.
>
> . . .
>
> I will submit my person, place of residence, vehicle, or property to a search at any time of the day or night by my assigned Probation Officer or designee.

(Gov't Ex. 3, ¶¶ E, M.) As a further condition of his furlough, Defendant had a curfew of 7:00 p.m. to 6:00 a.m., during which he was confined to the Hoisington residence.

In the early morning hours of December 14, 2015, a fire in Northfield, Vermont resulted in the death of one individual and severe injuries to another. Through witnesses and confidential sources of information, law enforcement believed the fire was the result of an arson that had been committed as part of a robbery of a drug dealer and his girlfriend who were doused with gasoline and set on fire.

On the afternoon of December 15, 2015, a confidential source of information wearing a wire recorded Defendant's father, Richard "Dickie" Hoisington, stating "Howie" was "involved" in the Northfield fire and that "they went there to rob him . . . a drug dealer, robbing him for drugs." (Gov't Ex. 1 at 000021, ¶ 13.) Dickie Hoisington further stated that "Howie" was with "J Zampieri" and Tammy Wilder a/k/a "Ma Tam" who had been setting up the drug dealers so that they could be robbed.

Vermont State Police ("VSP") officers subsequently effected a traffic stop of Dickie Hoisington for driving without a license. After receiving *Miranda* warnings,

2

Dickie Hoisington advised law enforcement that Defendant was currently living at the Hoisington residence and could be located there. He further advised that Defendant had stated that he, "Tammy," and "J" went to Northfield because Tammy needed money and that they intended to steal drugs. Defendant described spraying a male with gasoline and when "J" ignited a lighter, "everything caught on fire." *Id.* at 000022, ¶ 16b. Dickie Hoisington reported smelling gasoline in his trailer for the past few days and expressed his belief that "J" had blisters on his left hand from the fire. At approximately 6:49 p.m., VSP officers conducted a traffic stop and arrested Jonathan Zampieri and Tammy Wilder.

Throughout the daytime hours of December 15 and into the evening, VSP officers conducted surveillance on the Hoisington residence in anticipation of Defendant's arrest. At approximately 8:22 p.m., Special Agent ("SA") Matthew Ekstrom of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") sought and obtained a federal search warrant for the Hoisington residence, which authorized a search at any time of the day or night from December 15, 2015 until December 29, 2015. The search warrant identified the Hoisington residence as 427 Junction Road, Lot #2, Montpelier, Vermont. It described the property to be searched as follows:

### PROPERTY TO BE SEARCHED

The property located at 427 Junction Road, Lot #2, Montpelier, Vermont, is a tan single wide trailer that is located at the southwest corner of the intersection of Park Manor Road and Junction Road in Montpelier. Lot #2 is the first lot on the right as one turns onto Park Manor Road from Junction Road. There is a gravel parking area to the side of the trailer and a small porch that leads to the main door.

*Id.* at 001635. SA Ekstrom obtained the 427 Junction Road address and property description from a VSP officer who was conducting surveillance that day.[2]

In preparation for the search warrant, SA Ekstrom verified the 427 Junction Road address on Google Maps and obtained satellite and street-level photographs which depicted a property matching the description he had received. He did not, however,

---

[2] SA Ekstrom's affidavit in support of his search warrant application incorrectly asserts that the 427 Junction Road address was derived from Department of Motor Vehicle records for Dickie Hoisington.

3

notice that Google Maps identified the subject property as located in Berlin, Vermont rather than the adjoining municipality of Montpelier.

Although the search warrant application included a checked box for "[t]he basis of the search under Fed. R. Crim. P. 41(c)" to include "a person to be arrested or a person who is unlawfully restrained" (*id.* at 000015), SA Ekstrom's supporting affidavit did not provide a description of Defendant or request that a search warrant be granted to search for him. As a result, the search warrant did not authorize a search for Defendant.

After obtaining the search warrant, SA Ekstrom proceeded to a "staging area" set up by law enforcement in the parking lot of the Montpelier train station, which is located a short distance east of the Hoisington residence. In light of the violent nature of the crime under investigation, the unknown number of individuals inside the Hoisington residence, and Defendant's criminal history, SA Ekstrom and VSP Captain J.P. Sinclair decided to enlist the VSP Tactical Services Unit ("TSU") to execute the search warrant.

The TSU is a group of trained officers that specializes in executing high-risk search warrants and arrests. In anticipation of the execution of the search warrant for the Hoisington residence, TSU members were briefed at VSP's Middlesex barracks and were shown photographs of the Hoisington residence and Defendant. They were also provided Defendant's criminal record for purposes of a threat assessment. Law enforcement formulated a plan to evacuate the surrounding trailers, order everyone out of the Hoisington residence, perform a protective sweep, and secure the Hoisington residence overnight as law enforcement lacked sufficient manpower to complete the search that evening.

In furtherance of the plan, on the evening of December 15, 2015, members of the TSU evacuated the neighboring trailers and formed a perimeter around the Hoisington residence.[3] TSU members were armed and equipped with military-style helmets and protective gear. The primary negotiator assigned to the operation, VSP Trooper Michael

---

[3] The north side of the rectangular lot on which the Hoisington residence is located borders Junction Road and is lined with a row of hedges. The west side of the lot is lined with trees. The front entrance of the Hoisington residence faces south onto a driveway.

4

Mattuchio, attempted to contact Dickie Hoisington on his cell phone for approximately fifteen minutes but received no answer. He and a TSU member then drove an armored vehicle known as a "Bearcat" in front of the main entrance to the Hoisington residence and activated the vehicle's blue lights. Using the vehicle's public address system, Trooper Mattuchio commanded the occupants to leave the Hoisington residence with words to the effect of: "Come out. We have you surrounded. Exit the Residence. Show us your hands." He issued these commands for approximately twenty minutes. In response, three individuals left the residence through the front door and were taken into custody.

While Trooper Mattuchio issued commands over the public address system, Sergeant Matthew Daley was positioned with another TSU member along the northern perimeter of the lot where the hedgerow meets the tree line. Sergeant Daley was wearing night-vision goggles and could observe the back door of the Hoisington residence. From his position, he observed a person exit the Hoisington residence through the back door and begin "walking with a purpose" towards the tree line on the western edge of the lot. When the person reached the tree line, law enforcement ordered the person to stop and kneel. Sergeant Daley illuminated the person's face and recognized him as Defendant based upon the photograph circulated at the briefing earlier that evening. He placed Defendant in handcuffs without incident. After he was handcuffed, Defendant asked: "Why am I under arrest?" Sergeant Daley replied that a detective would talk to Defendant at a later time. Other members of the TSU then secured the Hoisington residence. No search for evidence took place that night.

The following morning, SA Ekstrom discovered that while VSP officers were securing the residence, they determined that its correct address was Park Manor Drive, Lot #10, Berlin, Vermont. In consultation with an Assistant United States Attorney, SA Ekstrom applied for a revised search warrant reflecting this address of the Hoisington residence. The corrected search warrant was issued on December 16, 2015 at 10:00 a.m. The corrected search warrant was identical in all material respects to the initial search warrant, with the exception of the corrected property address. SA Ekstrom filed a return

5

for the initial search warrant with the following notation: "Warrant not executed as physical address of search warrant location was determined to be Park Manor Drive, Lot #10, Berlin, VT. See additional federal search warrant under this case number." (Gov't Ex. 1 at 001634.)

## II. Conclusions of Law and Analysis.

The Fourth Amendment to the United States Constitution states that:

[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980) (internal quotation marks and footnote omitted). For this reason, law enforcement is prohibited "from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest . . . [a]bsent exigent circumstances[.]" *Id.* at 576, 590.

The Second Circuit recently rejected the proposition that "*Payton*'s warrant requirement be limited to cases in which the arresting officers themselves cross the threshold of the home before effecting an arrest" and has held that "[t]he protections of the home extend beyond instances of actual trespass." *United States v. Allen*, 813 F.3d 76, 85-86 (2d Cir. 2016). In *Allen*, law enforcement officers arrived at the defendant's apartment with a "pre-formed plan" to arrest him without a warrant. *Id.* at 78 (internal quotation marks omitted). While remaining on the sidewalk, the officers summoned the defendant from a second-floor porch to speak with them at his front door. The officers made inquiries regarding a recent assault and then informed the defendant, who remained inside the threshold, that he would need to accompany them to the police station to be processed for the assault. The Second Circuit concluded that such an "across the threshold" arrest violated the Fourth Amendment and explained that "irrespective of the

6

location or conduct of the arresting officers, law enforcement may not cause a suspect to open the door of the home to effect a warrantless arrest of a suspect in his home in the absence of exigent circumstances." *Id.* at 85.

*Allen* is distinguishable from the present case because law enforcement summoned Defendant out of his residence pursuant to a search warrant. "*Payton* did not hold . . . that an arrest warrant is the exclusive basis upon which police may arrest a suspect in her home. . . . If anything, *Payton* suggests that officers in possession of a search warrant have gone above and beyond what the Fourth Amendment requires before they may arrest a resident in her home." *Russell v. Harms*, 397 F.3d 458, 466 (7th Cir. 2005). Consistent with *Payton*, "police executing a valid search warrant may arrest a resident found within the permissible scope of that search if the officers have probable cause to believe that the resident has committed a crime." *Id.* The Second Circuit has endorsed this reasoning in an unpublished decision:

> Russell next argues that his written statement to the police should have been suppressed because his arrest inside his own home violated *Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L.Ed.2d 639 (1980). The police, however, entered Russell's home pursuant to a lawful search warrant, and probable cause supported Russell's arrest. No violation of *Payton* therefore occurred.

*United States v. Russell*, 501 F. App'x 67, 69 (2d Cir. 2012); *accord United States v. Winchenbach*, 197 F.3d 548, 553 (1st Cir. 1999) (holding that police may "arrest an individual in his home, without an arrest warrant, as long as they are lawfully on the premises (by reason, say, of a search warrant) and probable cause exists"); *Mahlberg v. Mentzer*, 968 F.2d 772, 775 (8th Cir. 1992) ("We see no Fourth Amendment distinction between the authority to seize items in plain view incident to a lawful search and the authority to arrest a suspect in his home when the lawful search uncovers probable cause that the suspect has committed a crime."). As the Tenth Circuit has explained:

> A search warrant represents a judicial determination that there is probable cause to invade the privacy of the suspect's home. The impartial determination that supports the issuance of a *search* warrant justifies a greater intrusion than that supporting the issuance of an arrest warrant. Thus, once an officer has procured a *search* warrant, the privacy interests

7

that led to the imposition of an *arrest* warrant requirement in *Payton* have been protected.

*Jones v. City & Cty. of Denver, Colo.*, 854 F.2d 1206, 1209 (10th Cir. 1988); *see also* 3 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 6.1(c) (5th ed.) (commenting that "cases have consistently held that a warrantless arrest within premises is permissible when the prior entry was gained by executing a search warrant for physical evidence or pursuant to some other legal process that permits entry").

As a result, the fact that law enforcement arrested Defendant pursuant to a search warrant rather than an arrest warrant does not give rise to a *Payton* violation because "the distinction between a search warrant and an arrest warrant [i]s far less significant than the interposition of the magistrate's determination of probable cause between the zealous officer and the citizen[.]" *Michigan v. Summers*, 452 U.S. 692, 704 (1981).[4] *Payton* does "not support the proposition that the police must have an *arrest* warrant to arrest a person incidental to a lawful entry under a *search* warrant." *Phelan v. Sheahan*, 2013 WL 149476, at *8 (N.D.N.Y. Jan. 14, 2013) (footnote omitted).

Defendant contends that his arrest was unlawful for the further reason that the search warrant pursuant to which he was arrested was never executed. "[T]he duty of a [court reviewing the validity of a search warrant] is simply to ensure that the magistrate had a substantial basis for conclud[ing] that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983) (internal quotation marks and ellipses omitted) (second brackets in original). "A search warrant issued by a neutral and detached magistrate is entitled to substantial deference, and doubts should be resolved in favor of upholding the

---

[4] This is not to say that no difference exists between the two because, as the Supreme Court has recognized, "the interests protected by the two warrants differ[:]"

> An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

*Steagald v. United States*, 451 U.S. 204, 213 (1981).

8

warrant." *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (internal quotation marks omitted).

Defendant points out that the initial search warrant for the Hoisington residence contained an incorrect street address. It is well established that "inaccuracies or ambiguities in a warrant do not necessarily render a warrant invalid under the Fourth Amendment." *United States v. Voustianiouk*, 685 F.3d 206, 212 (2d Cir. 2012). "Courts of Appeals have rejected Fourth Amendment challenges to warrants that contain partial misdescriptions of the place to be searched so long as the officer executing the warrant could ascertain and identify the target of the search with no reasonable probability of searching another premises in error[.]" *Velardi v. Walsh*, 40 F.3d 569, 576 (2d Cir. 1994) (internal quotation marks and italics omitted). "Warrants have been upheld despite 'technical errors,' such as an incorrect street address, when the possibility of actual error is eliminated by other information" such as "a detailed physical description in the warrant itself, supplemental information from an appended affidavit, or knowledge of the executing agent derived from personal surveillance of the location to be searched." *Id.*; *see also Steele v. United States*, 267 U.S. 498, 503 (1925) (noting that "[i]t is enough if the description is such that the officer with a search warrant can, with reasonable effort ascertain and identify the place intended").

Here, the initial search warrant accurately described the Hoisington residence as a tan, single-wide trailer located on the first lot on the southwestern corner of Junction Road and Park Manor Road.[5] Prior to the search warrant's issuance, law enforcement officers in contact with SA Ekstrom conducted surveillance on the Hoisington residence, thereby significantly reducing the possibility of searching the wrong trailer. Both the initial search warrant and the corrected search warrant adequately described the property to be searched so that "there could be no doubt" regarding the property subject to the search warrant. *United States v. Fitzmaurice*, 45 F.2d 133, 135 (2d Cir. 1930) (upholding a search despite a "negligible" error in the warrant because "[i]f one followed the warrant

---

[5] The satellite photos admitted at the hearing indicate that the road is called "Park Manor Drive."

9

one must reach the proper building, about whose identity there could be no doubt, except by an over-scrupulous regard to the letter").

In an abundance of caution, SA Ekstrom corrected the address in a subsequent search warrant. The revised warrant was otherwise identical to the initial warrant pursuant to which law enforcement effected Defendant's arrest. There can be no reasonable argument that this good faith correction of the search warrant invalidated law enforcement's actions on the previous evening. It thus matters not that the return for the initial warrant erroneously indicates it was not executed. It is beyond dispute that law enforcement began the execution of the search pursuant to the initial search warrant and concluded it pursuant to the revised search warrant. There was no lapse of authority to search under this approach.

Because the warrant to search the Hoisington residence was valid, the members of the TSU who were tasked with executing the warrant possessed the authority to order Defendant out of the Hoisington residence to secure it in anticipation of their search. *See Los Angeles Cty., Cal. v. Rettele*, 550 U.S. 609, 614 (2007) (per curiam) (holding that in executing a search warrant, law enforcement may "take reasonable action to secure the premises and to ensure their own safety and the efficacy of the search"); *Summers*, 452 U.S. at 705 (holding that law enforcement officers may "detain the occupants of the premises while a proper search is conducted"). Taking such protective measures did not, without more, effect Defendant's arrest. *See Summers*, 452 U.S. at 702 (holding that the detention of a person incident to the execution of a search warrant of his or her residence is "'substantially less intrusive' than an arrest"); *United States v. Cunningham*, 2012 WL 369923, at *4-5 (D. Vt. Feb. 3, 2012) (holding that no arrest occurred where defendant was detained pursuant to a protective sweep of his residence and the execution of a search warrant and the circumstances otherwise did not support the conclusion that he was in custody).

Once lawfully ordered outside the Hoisington residence, law enforcement had probable cause to arrest Defendant for his suspected involvement in the Northfield fire. Information provided by confidential sources and by Dickie Hoisington indicated that

10

Defendant had participated in the Northfield fire as part of a robbery of a drug dealer. Under such circumstances, law enforcement officers were "in possession of facts sufficient to warrant a prudent person to believe that the suspect had committed or was committing [a felony] offense" and had probable cause to arrest Defendant without securing an arrest warrant. *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997). Defendant's arrest therefore did not violate the Fourth Amendment or *Payton*. *See Russell*, 501 F. App'x at 69 (holding that no violation of *Payton* occurred where the defendant was arrested in his residence based on probable cause and pursuant to a search warrant); *Phelan*, 2013 WL 149476, at *8 (holding that "[b]ecause the police were lawfully in [the suspect's] residence, as long as they had probable cause the police were entitled to arrest him"); *see also United States v. Watson*, 423 U.S. 411, 418 (1976) (recognizing "the ancient common-law rule that a peace officer was permitted to arrest without a warrant for . . . a felony not committed in his presence if there was reasonable ground for making the arrest"); *State v. Towne*, 158 Vt. 607, 629, 615 A.2d 484, 496 (1992) (concluding that "a state law enforcement officer, who has a reasonable belief that a federal felony has been or is being committed, may make a warrantless arrest"); Vt. R. Crim. P. 3(a) ("A law enforcement officer may arrest without warrant a person whom the officer has probable cause to believe has committed or is committing a felony.").

Because the court concludes that Defendant was lawfully arrested incident to the execution of a valid search warrant, the court DENIES Defendant's motion to suppress. The court therefore need not address the government's alternative argument that Defendant could have been arrested in the Hoisington residence because he had a diminished expectation of privacy as a result of his furlough conditions. *See United States v. Knights*, 534 U.S. 112, 122 (2001) (holding that "the warrantless search of [a probationer], supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment" where the probationer's apartment was searched after law enforcement developed reasonable suspicion to believe he possessed incendiary materials).

## CONCLUSION

For the foregoing reasons, the court hereby DENIES Defendant's motion to suppress. (Doc. 119.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 27th day of June, 2017.

Christina Reiss, Chief Judge
United States District Court